UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

SCOTT SUMPTER,

                        Plaintiff,

v.                                              Case No.  5:04-cv-530-Oc-10GRJ

JO ANNE B. BARNHART,
Commissioner of Social Security,

                        Defendant.
_____/

### ORDER

        Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying his application for Supplemental Security

Income. (Doc. 1.) The Commissioner has answered (Doc. 8), and both parties have filed

briefs outlining their respective positions. (Docs. 17 & 18.) For the reasons discussed

below, the Court finds that the Commissioner's decision is **REVERSED AND**

**REMANDED**.

### I.  PROCEDURAL HISTORY

        Plaintiff filed an application for Supplemental Security Income (SSI) on January

18, 2001, protectively, alleging an onset date of August 15, 1997. (R. 113-16.) This

application was denied initially (R. 75-80) and upon reconsideration.  (R. 86, 94.)

Plaintiff requested a hearing before an Administrative Law Judge, which was held on

November 4, 2003. On January 15, 2004, following the hearing, Administrative Law

Judge James R. Ciaravino (the "ALJ") issued a decision unfavorable to Plaintiff. (R. 15-

22.) Plaintiff's request for review of that decision was denied by the Appeals Council on

September 23, 2004, rendering the ALJ's decision the final decision of the

Commissioner. (R. 5-7.)

## II.  ISSUES PRESENTED

The primary issue Plaintiff raises on appeal is whether the hypothetical

propounded by the ALJ to the Vocational Expert ("VE") detailing Plaintiff's RFC should

have included the functional limitations Dr. Medero disclosed in his report.  Specifically,

the Plaintiff challenges the fact that the ALJ did not include the part of Dr. Medero's

report which stated that Plaintiff "is able to ambulate a distance of one block before

requiring a rest of 10 minutes."

## III.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which

---

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6]42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7]42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

3

significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[16]

---

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

## IV.  SUMMARY OF THE RECORD

### A.  Personal Background

Plaintiff, born October 3, 1954, was forty-nine years old at the time of the hearing.  Plaintiff receives food stamps, but he is not eligible for any other public

---

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996).  See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

benefits or Medicaid.[21] Plaintiff completed the ninth grade (R. 133),[22] but has not received any additional educational or vocational training. He is able to read, write, and do simple math at his educational level.[23] He previously worked as a stock clerk, in maintenance, as a fish cutter, carpet layer, and commercial fisherman.[24] All of his past relevant work is considered unskilled or skilled requiring heavy physical exertion. (R. 123, 128, 140.)

In his maintenance job, Plaintiff cleaned and maintained boats, but did not do any major repairs. His job required to him walk and stand for four hours a day and climb or stoop several times a day as well as kneel, crouch, or crawl. He used a buffer and other hand tools to clean the boats. He frequently lifted objects weighing fifty pounds or more. (R.141.) Prior to this employment, Plaintiff was self-employed and performed home improvement work. (R. 50, 142.) He also used various tools in this job and performed electrical, plumbing, carpentry, dry wall, and general home repairs work. The physical requirements of this job were similar to those discussed above. (R. 142.) Plaintiff also worked as an assistant warehouse manager where he delivered and

---

[21] Plaintiff claims that his financial situation has prevented him from obtaining the medical care he needs to treat his illnesses and some basic necessities.  (R. 151, 153.)

[22] Plaintiff testified at the proceeding that he stopped attending school halfway through the tenth grade.  (R. 49.)

[23] Plaintiff testified he can write but his handwriting is very poor due to the arthritis in his hands. He also testified that his reading is very poor. (R. 49.)

[24] Plaintiff worked at a number of jobs over the past fifteen years and the record contains inconsistent information with respect to when Plaintiff held each job or for how long he worked in that particular position.  (R. 54, 128, 140,157.)

stocked aluminum extensions.[25] (R. 143.) The physical requirements of this job were similar to those previously discussed, although Plaintiff frequently only had to lift objects of between twenty to thirty pounds. (*Id.*) Lastly, Plaintiff worked as a fish cutter, cutting and cleaning fish for customers. He also drove a forklift in that job and frequently lifted objects of fifty pounds or more. This job required him to walk two hours a day, stand five hours a day, and sit for one hour. (R. 144.)

Plaintiff also worked as a commercial fisherman, cleaning, inspecting, and operating fishing nets as well as sorting fish. He spent eight to twelve hours a day walking, four hours sitting, two climbing, one to two kneeling, one crouching, three stooping, and also spent various amounts of time handling large and small objects. He, at times, lifted a net of fish which weighed one hundred pounds or more, but frequently lifted objects of only ten pounds. (R. 157.) Most recently, Plaintiff attempted to work one day a week for about six months as a stock clerk, but could not work this minimal amount due to difficulty standing, bending, and lifting. (R. 156, 157.)

## B.  The Medical Evidence

Because the Plaintiff only challenges whether Dr. Medero's functional limitations should have been included in a hypothetical to the VE, the Court will limit its discussion of the medical evidence to that evidence which deals with Plaintiff's ability to walk, the report of Dr. Medero, and the hypotheticals given to the VE.

---

[25] Plaintiff testified that while he was on the books at the aluminum plant as a warehouse worker, he really was a chauffeur for his father-in-law who was an aluminum salesman.  (R. 56.)

### *Plaintiff's Back Pain, Knee Pain, and Ability to Walk*

Plaintiff complained of disability due to neck, knee, and back pain which occurred after sustaining injuries in a car accident. (R. 169, 122, 124,127,156, 172,186-187.) He was treated by various doctors who prescribed medications and physical therapy after his knee surgery. (R. 129,148-149, 178.)

Throughout 1997 and 1998, Plaintiff was treated by Dr. Alan M. Lazar, an orthopedist. (R. 127.) Dr. Lazar diagnosed Plaintiff with a cervical sprain or strain and post traumatic chondromalacia.[26]  (R. 187, 30.)  He gave Plaintiff a knee brace and prescribed Vicodin, Skelaxin, and DayPro for pain. The doctor noted that Plaintiff "neurologically" was "grossly intact" and did not have major radiculitis. On January 12, 1998, Dr. Lazar found that based on Plaintiff's clinical condition he had reached "M.M.I."[27] and that according to the American Medical Association Guidelines, Plaintiff had "incurred a permanent medical impairment of 10% to the body as a whole representing injuries involving the cervical and lumbar spine and knee." (R.185.)  In April of 1998, the Plaintiff returned to Dr. Lazar who noted that Plaintiff still had significant spasm, pain, and loss of motion. (R. 183.)

In September of 2003, Plaintiff was treated by Dr. Howard Vesser at the Community Medical Care Center for complaints of knee and hip pain. Dr. Vesser found Plaintiff's knee had a slight medial laxity. In August of 2003, Dr. Vesser noted that Plaintiff had a severe limp on his right leg. (R. 301, 304.) Dr. Vesser prescribed pain

---

[26] Chondromalacia refers to anterior knee pain.  2-7 Attorneys' Textbook of Medicine P. 7.70 (3d ed. 2005).

[27] M.M.I. stands for "Maximum Medical Improvement." (R. 41.)

medication to Plaintiff for his back problems. (R. 38.) X-rays taken in 2003 revealed mild

osteoarthritis in the left knee (R. 290), degenerative disc disease, and a small joint

effusion of the right knee. (R. 291, 293.) The x-ray of Plaintiff's cervical spine revealed

neural forminal narrowing at the C3-C4 level. (R. 292.)

Plaintiff testified that he cannot stand or sit for more than ten minutes due to

problems with his back, shoulders, neck, legs, and knees. (R. 58-59.) He also testified

that his knees affect his ability to walk. (R. 58.) Plaintiff claimed he has no stamina or

strength to do anything.  (R. 60.)  He can perform most household chores and grocery

shopping for himself, but he cannot exert himself for long periods of time and must

frequently rest. (R. 174, 149-150, 170-71.) In the disability report filed at the agency field

office, the interviewer noted that Plaintiff seemed uncomfortable when sitting and "was

slow and deliberate when walking."[28] (R. 138.) He does not do much driving because of

his problems sitting, and he has trouble fishing. Plaintiff noted that his social activities

and hobbies now consist of going to church, watching TV, and reading.

On February 5, 2002, Plaintiff was seen by Dr. Donald J. Tindall for a

consultative examination. Dr. Tindall noted that Plaintiff could independently perform

activities of daily living. (R. 250.) He noted that Plaintiff walks with a limp favoring the

right lower extremity, but did not have significant difficulty getting out of a chair or on

and off the examining table. Plaintiff was found to have a right and left paraspinous

muscle spasm at T10-L4 and tenderness over the right iliolumbar notch as well as

positive right sitting root and sciatic nerve stretch signs. He did not find any decreased

---

[28] A prior field office report made no such findings about Plaintiff's limitations, but that interview
was done over the phone while the interview discussed above was a face-to-face interview. (R. 167.)

sensation or muscle atrophy of the lower extremities. Dr. Tindall noted decreased range of motion in Plaintiff's thoracolumbar spine and shoulder and mild diffuse swelling of the left shoulder. Right and left knee tenderness was found over the medial and lateral femoral epicondyles with bony deformity and a slightly reduced range of motion of the right knee compared to the left. (R. 251.)

Dr. Tindall reviewed Plaintiff's old medical records and made the following diagnosis based on this review and his exam. He could not determine the cause of plaintiff's low back pain but suspected it was a disc problem. He noted that Plaintiff's left shoulder pain was most likely caused by rotator cuff tendonitis and subacromial bursitis. Dr.Tindall could not determine the cause of Plaintiff's knee pain, but he concluded that Plaintiff "lacks the functional capacity to do construction or mechanic type work on a full or part time basis." (R. 252.)

Agency physician Dr. Green completed a Physical Residual Functional Capacity Assessment of the Plaintiff in March 2002. Dr. Green noted that Plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, stand and/or walk for at least two to three hours in an eight hour workday and sit about six hours in an eight hour workday. (R. 254, 256.) Dr. Green noted that Plaintiff had untreated multi-joint pains and a history of motor vehicle accidents causing multiple sprains, back problems, and knee arthroscopies. He had decreased ROM of the shoulders, spine and knees from exams in March 2001 and February 2002, but normal hand function and independent, but slightly antalgic gait. He recommended that Plaintiff be limited to sedentary exertion and never be required to climb a ladder, ropes, or scaffolds or crawl. He should only be required to occasionally assume all other postural positions (climbing

10

ramp/stairs, balancing, stooping, kneeling, and crouching). (R. 254.) Dr. Green fond no

other limitations on Plaintiff other than to avoid even moderate exposure to hazards

such as uneven terrain or open heights. (R. 257.) He also noted that Plaintiff stated he

is able to complete household chores. (R. 258.)

In May of 2002, Dr. Jim Takach completed an RFC Assement of Plaintiff for the

agency.  (R. 274-281.)  Dr. Takach's report differed from Dr. Green's only in that he

noted Plaintiff could occasionally lift twenty pounds, had unlimited push and pull

abilities, and his recommendation as to Plaintiff's ability to stand or walk is somewhat

unclear from the markings on the report. (R. 275.) Dr. Takach had previously completed

an assessment of Plaintiff in July of 2001. (R. 282-289.) The only significant difference

between the two reports was that in 2001 Dr. Takach noted that Plaintiff could stand

about six hours in an eight hour workday and had limited upper extremity push/pull

ability due to restricted overhead movement.  (R. 283.)

On March 20, 2001, Dr. Mario Medero issued a disability report to the Florida

Department of Health Office of Disability Determination after conducting a consultative

examination.  Dr. Medero noted that Plaintiff's knee pain was related to his work as a

carpet and vinyl flooring installer (R. 261). He found crepitus[29] to both shoulders, but the

right more so than the left on movement.  He found Plaintiff had discomfort upon

movement of his lumbar spine and tenderness to palpation over the bilateral sacroiliac

areas. Plaintiff had tenderness to the medial and lateral joins in his right knee and

---

[29] Crepitus occurs when there are "grating or crackling sensations that occur with movement, probably cause by the irregular surface of the cartilage" or bones.  6-19B Attorneys' Textbook of Medicine P 19B.40 (3d ed. 2005).

medial joint line of the left knee. There was significant crepitus on range of motion to both knees. Dr. Medero also noted that Plaintiff experienced discomfort on a range of motion beyond ninety degrees in both knees. (R. 263.) Plaintiff's motor strength was found to be 5/5 in all major musculoskeletal groups examined. (R. 264.)

Dr. Medero did not detect any neurological sensory or motor deficits. He found Plaintiff to be alert, oriented, with normal affect and mood and intellectual functioning. In summarizing his diagnostic impressions, Dr. Medero found Plaintiff had the following conditions: herniated disc cervical spine, lumbar pain, one episode of hypoglycemia, incisional hernia to the upper abdomen, degenerative joint disease of bilateral knees, osteoarthritis to both hands, and pain in both shoulders. As to Plaintiff's functional assessment, Dr. Medero noted decreased cervical and lumbar spine range of motion, but no muscle spasms, in addition to the findings discussed above. Plaintiff's straight and seated leg raises, grip strength and fine manipulation were normal. Although Dr. Medero's report revealed that Plaintiff's gait was normal without an assistive device, Dr. Madero's functional assessment included the finding that Plaintiff only was "able to ambulate a distance of one block before requiring a rest of 10 minutes." (R. 265.)

### C. Vocational Expert Reports and Testimony

At step four of the disability analysis the ALJ determined that the Plaintiff could not perform his past relevant work. The burden then shifted to the Commissioner to show that there were a significant number of jobs in the national economy that the Plaintiff could perform. The ALJ found that the Plaintiff had an RFC to perform a significant range of light work (R. 19, 21), but that because the Plaintiff could not perform a full range of light work due to exertional and/or non-exertional limitations, it

12

was necessary to call a vocational expert to testify as to whether there were a significant number of jobs in the national economy which the Plaintiff could perform given his RFC and other vocational factors. (R. 20.)

The ALJ called Dr. William S. Summit as a vocational expert ("the VE"). (R. 60, R. 111, 180-181.) The record also contains a report by Dr. Summit outlining the strength requirements of Plaintiff's past relevant work.  (R. 179.)  The ALJ noted that all of Plaintiff's past relevant work required medium to heavy physical exertion and that the agency RFC and Department of Disability assessments found that Plaintiff could only perform light to sedentary work.  At the hearing, the ALJ posed the following hypothetical to the VE:

> If we had a young man with a limited education, past work experience of a medium to heavy nature. . . . [A] lot of jobs were short-term . . . But over the year very minimal earnings. . . . Pushing and pulling, limited in the upper extremities, only occasional overhead work bilaterally.  No ladders, ropes, scaffolding, otherwise Posturally [sic] occasional limitations. . . . Occasionally I guess would be one-third of the day.  Manipulative, no limitation.  Visual, communication, environmental, no limitations except for avoiding even moderate exposure to hazards, machinery and heights.   With those limitations, would he be able to return to any of his jobs?[30]  (R. 63- 64.)

The VE replied that Plaintiff could not do his past relevant work given that RFC.

The ALJ then asked the following:

---

[30] Unless otherwise noted, the hypotheticals the ALJ proposes are based on the RFC assessments by the agency physicians.

> [W]ould [there] be other work available within that light category[31] with the restrictions on overhead lifting and carrying?  And the hazards, height and machinery, moderate exposure? . . . Limited education.  He only got to the 9th or 10th grade.  He testified that his reading abilities are not what they could be and because he was poor educated and I believe to the writing [sic].  He related that to the use of his hands, though.  (R. 64.)

The VE then testified that there were a number of jobs that would probably fit this hypothetical including work as a packer, an inspector, and assembly jobs. (R. 65-66.)

The ALJ then referred to other assessments made during 2001 which stated that Plaintiff could only perform sedentary work.[32]  (R. 66-67.) The ALJ asked the VE if there were jobs in the national economy with respect to the following hypothetical:

> And they had him down to sedentary and at least two hours and then he wrote in three hours.  Said he can stand and walk about two, three hours in an eight-hour workday.  The say he can sit for six in eight hours.  Again, pushing and pulling limited in the upper extremities, occasional overhead reaching bilaterally.  Then the, again with the postural restrictions, no ladders, rope or scaffolding.  Everything else is occasionally.  Now with the manipulative limitations, the reaching in all directions with [sic] including overhead is limited.  And then he has up there less then 10 pounds I guess as the reaching.  Overhead, occasional overhead reaching bilaterally because of shoulder problems.  But then he says handling, fingering and feeling is all unlimited. Again with the avoid concentrated exposure to unprotected heights.  As diffused joint pains eased by Aleve.  He does mild household chores and activities while avoiding frequent bending and reaching up.  With those restrictions would that still allow the sedentary jobs that you--(R. 67.)

---

[31] Light work is defined in the Regulations as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may ve very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods." 20 C.F.R. § 416.967.

[32] *See* R. 254, assessment by Dr. Green.

The VE testified that even with those restrictions, Plaintiff could still perform the sedentary jobs he had previously discussed. (*Id.*)

The ALJ then asked the VE if he would change his recommendations in light of Dr. Tindall's findings that Plaintiff may have a disk problem, rotator cuff tedonitis or bursitis, degenerative arthritis in his hands and wrists, and "lacks the functional capacity to do construction or mechanic type work on a full or part-time basis." The VE testified that none of these findings would detract from Plaintiff's ability to perform sedentary work, although he could not "quantify" Plaintiff's complaints of pain in his calculations. (R. 69.) However, Plaintiff's representative asked the ALJ to amend the hypothetical with "full credibility to the claimant's testimony." The VE then testified that if the Plaintiff's testimony was given full credibility there would *not* be jobs remaining in the national economy which Plaintiff could perform. (R. 70.)

## V. DISCUSSION

The primary issue on appeal is whether the ALJ erred in failing to include in the hypothetical posed to the VE the limitation by Dr. Medero that Plaintifff could only "ambulate a distance of one block before requiring a rest of ten minutes."  The ALJ did not address this functional limitation from Dr. Medero's disability report in determining the Plaintiff's RFC.  However, in response to the last hypothetical given, the VE replied that if all of Plaintiff's complaints were credible, there would not be any work for Plaintiff in the national economy.  The VE specifically mentioned Plaintiff's claim that he is unable to walk more than a block without resting as one of the other unspecified factors which were part of the VE's determination that there would not be any jobs for Plaintiff to perform.

15

The Court is unable to discern from that hypothetical and the VE's statement whether Plaintiff's inability to walk more than a block without resting by itself is enough to erode the employment base for light or sedentary work. The ALJ found that Plaintiff could perform light work with some limitations, but specifically noted that for light work "the weight lifted may be very little, [but] a job is in this category *when it requires a good deal of walking or standing*, or when it involves sitting most of the time with some pushing or pulling or arm or leg controls."[33] As the VE mentioned, a functional limitation regarding Plaintiff's ability to walk might erode both levels of work entirely.  Therefore, the functional limitation in Dr. Madero's report concerning Plaintiff's inability to walk more than one block without resting is material to the determination of Plaintiff's RFC. Because this limitation would be material to the RFC, by necessity it will impact the determination of whether there is work in the national economy that Plaintiff can perform.

"The ALJ may reject any medical opinion if the evidence supports a contrary finding."[34] However, the ALJ must, at least, weigh and discuss all of the relevant medical source opinions, even those of a consultative physician such as Dr. Medero. Furthermore, a consultative examiner's opinion is entitled to more weight than the opinion of a non-examining physician,[35] and it appears that the ALJ based his RFC on

---

[33] Emphasis added.

[34] *Id.*

[35] Broughton v. Heckler, 776 f.2d 960, 962 (11th Cir. 1985) (citing Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B 1981) and noting that in Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982), this Circuit adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit.)

the Residual Functional Assessment of the non-examining agency physician, Dr.

Takach.[36] It is error for the ALJ to ignore the opinions of Plaintiff's consultative and

treating physicians, especially when contrary to the assessment of a non-examining

physician. Further, it is insufficient for the ALJ to simply state that "the undersigned

notes a lack of supportive evidence for the severity of his pain or degree of functional

limitations" without a specific discussion of the evidence as a reason to adopt the

opinions of the non-examining agency physicians.

As discussed above, there is considerable evidence in the record to support Dr.

Medero's conclusion that Plaintiff has difficulty walking for more than a block.  As far

back as 1997, Plaintiff was treated for knee and back pain and prescribed a knee brace

and pain medication. The interviewer at the agency field office noted that Plaintiff's walk

was "slow and deliberate."  In February 5, 2002, Dr. Tindall noted that Plaintiff walked

with a limp favoring his right leg. While he could not determine the cause of Plaintiff's

knee problems he concluded that Plaintiff "lacked the functional capacity to perform

construction or mechanic type work on a full or part time basis."  In March of 2002,

agency physician Dr. Green noted that Plaintiff could not stand and/or walk for more

than two to three hours in an eight hour workday and had a slightly antalgic gait.

In September of 2003, Dr. Vesser noted medial laxity in Plaintiff's knee and that

Plaintiff had a severe limp on his right leg.  At that time, x-rays revealed mild

osteoarthritis in the left knee.  (R. 290.) Plaintiff testified that his knees affected his

---

[36] Sharfarz, 825 F.2d at 280 ("The opinions of nonexamining, reviewing physicians . . . when contrary to those of the examining physicians are entitled to little weight, and standing alone do not constitute substantial evidence.").

ability to walk, he could not stand for more than ten minutes, and engaged in mostly sedentary activities, though he had some trouble sitting as well.  (R. 58-59.)  Based on this evidence, there is substantial support in the record for Dr. Medero's finding that Plaintiff could not "ambulate a distance of one block without requiring a rest of ten minutes." As a result, the ALJ erred in failing to take Dr. Medero's functional limitation into consideration in determining Plaintiff's RFC and in failing to include this functional limitation in the hypothetical posited to the VE.

## VI.  CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED AND REMANDED**. Upon remand the Commissioner should: (1) reassess Plaintiff' RFC, taking into consideration the functional limitations in the report by consultative examiner Dr. Medero, specifically Plaintiff's ability to walk only one block before requiring a ten minute rest; (2) include the determination of the new RFC in an appropriate hypothetical to the VE , and (3) conduct such further proceedings as the Commissioner deems appropriate. The Clerk is directed to enter final judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 6, 2006.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel